# UNITED STATES *v.* PATTEN.

ERROR TO THE CIRCUIT COURT OF THE UNITED STATES FOR THE SOUTHERN DISTRICT OF NEW YORK.

No. 282. Argued November 9, 10, 1911; reargued October 23, 24, 1912.—Decided January 6, 1913.

On appeal under the Criminal Appeals Act of March 2, 1907, this court must accept the lower court's construction of the counts, and its jurisdiction is limited to considering whether the decision of the

court below that the acts charged are not criminal is based upon an erroneous construction of the statute alleged to have been violated.

In order to decide whether acts charged are within the condemnation of a statute, the court must first ascertain what the statute does condemn and that involves its construction.

On appeal under the Criminal Appeals Act of 1907 this court must assume that the counts of the indictment adequately allege whatever the lower court treated them as alleging; and, where its decision shows that it assumed that every element necessary to form a combination was present, this court has jurisdiction to determine whether such a combination was illegal under the statute which defendants are charged with violating.

A conspiracy to run a corner in the available supply of a staple commodity which is normally a subject of interstate commerce, such as cotton, and thereby to artificially enhance its price throughout the country, is within the terms of § 1 of the Anti-trust Act of July 2, 1890.

Section 1 of the Anti-trust Act is not confined to voluntary restraints but includes involuntary restraints, as where persons not engaged in interstate commerce conspire to compel action by others or create artificial conditions, which necessarily affect and restrain such commerce.

A combination otherwise illegal under the Anti-trust Act as suppressing competition, is not the less so because for a time it may tend to stimulate competition—and so held as to a corner in cotton.

The Anti-trust Act does not apply to a combination affecting trade or commerce that is purely intrastate, or where the effect on interstate commerce is merely incidental and not direct; but although carried on wholly within a State, if the necessary operation of a combination is to directly impede and burden the due course of interstate commerce, it is within the prohibition of the statute; and so held as to a corner in cotton to be run in New York City.

Persons purposely engaging in a conspiracy which necessarily and directly produces the result which a prohibitory statute is designed to prevent are, in legal contemplation, chargeable with intending to produce that result; and so *held* that if the details of the conspiracy are alleged in the indictment an allegation of specific intent to produce the natural results is not essential.

The character and effect of a conspiracy is not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole.

187 Fed. Rep. 664, reversed.

THE facts, which involve the jurisdiction of this court under the Criminal Appeals Act of March 2, 1907, and whether a corner in cotton constitutes an illegal combination under the Sherman Anti-trust Act, are stated in the opinion.

*The Solicitor General* for the United States: [1]

The seventh count of the indictment charged that the defendants conspired to run a "corner" in cotton.

In construing the indictment the lower court held that the corner charged was an illegal combination, saying: "Corners are illegal. . They are combinations contrary to public policy and. all contracts and undertakings in support thereof are void. . . . A corner is altogether wrong, both from a legal and an economical standpoint. '. . . The combination described in these counts is negatively illegal without any prohibitory statute and would be positively unlawful in any State having a statute against corners."

Therefore, this court must assume that the indictment sufficiently alleged the existence of an illegal corner, as this court is bound by the construction which the lower court places upon the language used in the indictment. *United States* v. *Keitel,* 211 U. S. 370; *United States* v. *Biggs,* 211 U. S. 507.

Contracts of purchase or sale for future delivery are valid even though (1) the purchaser's object is pure speculation and he intends not to receive and pay for them but he expects to resell them before delivery; (2) the seller has not the goods in his possession and has no means of obtaining them except by subsequently purchasing them, and (3) the parties at the time of delivery in fact settle upon the "difference" in price without an actual delivery.

---

[1] Mr. Solicitor General Lehmann for the United States on the first argument.

It is only when both parties at the time of the contract intend to settle upon "differences" that the contract becomes illegal. *Sawyer, Wallace & Co.* v. *Taggart*, 14 Bush, 727; *Bibb* v. *Allen*, 149 U. S: 481, 492; *Clews* v. *Jamieson*, 182 U. S. 461, 489–495; *Board of Trade* v. *Christie Grain & Stock Co.*, 198 U. S. 236, 248; *Forget* v. *Ostigny*, App. Cas. (1895) 318.

A corner is a combination for the purpose of buying up for future delivery the greater portion of the available supply of a given commodity and entering into contracts for the future delivery of more than the available supply, and holding the same back from sale and not assigning or transferring the contracts of sale until the demand shall so outrun the supply as to enable the operators of the corner to advance the price abnormally. Black's Law Dictionary, 271; 9 Cyc. 978; *Booth* v. *Illinois*, 184 U. S. 425, 430.

Corners have universally been held to be illegal because affecting the natural course of trade and commerce and tending to enhance prices. *Arnot* v. *Pittston & Elmira Coal Co.*, 68 N. Y. 558; *Foss* v. *Cummings*, 149 Illinois, 353 (affirmed 40 Ill. App. 523); *Lamson* v. *Bryden*, 160 Illinois, 613; *Morris Run Coal Co.* v. *Barclay Coal Co.*, 68 Pa. St. 173; *Pacific Factor Co.* v: *Adler*, 90 California, 110; *Raymond* v. *Leavitt*, 46 Michigan, 447; *Sampson* v. *Shaw*, 101 Massachusetts, 145; *Samuels* v. *Oliver*, 130 Illinois, 73; *Wells* v. *McGeoch*, 71 Wisconsin, 196; *Wright* v. *Crabbs*, 78 Indiana, 487.

Any conspiracy although not technically a "corner" but having as its object the arbitrary increase or depression of prices is in restraint of trade. *Central Salt Co.* v. *Guthrie*, 35 Oh. St. 666; *Craft* v. *McConoughy*, 79 Illinois, 346; *India Bagging Association* v. *Kock*, 14 La. Ann. 168; *King* v. *Norris*, 2d Ld. Kenyon, 300; *Leonard* v. *Poole*, 114 N. Y. 371; *People* v. *Goslin*, 73 N. Y. Supp. 520; *People* v. *Milk Exchange*, 145 N. Y. 267; *People* v. *North*

*River Sugar Co.*, 54 Hun, 354; *People* v. *Sheldon*, 139 N. Y. 251.

The rule to be extracted from all those cases is that any combination whose object is the enhancement of prices by virtue of combined effort is in restraint of trade and illegal.

The numerous cases in this court have held that combinations (*a*) to fix rates for railway transportation, (*b*) to determine the prices to be bid for pipe in public competition, (*c*) to sell tiles at a fixed price to non-members of the combination, (*d*) to combine railroads in one management through a holding company, (*e*) to bid the same prices for fresh meats, (*f*) to boycott dealers in one State who purchased from a factory in another State, (*g*) to secure control of the petroleum trade by stock ownership, (*h*) to acquire the tobacco industry, and (*i*) to control even intrastate terminal facilities where the effect was to give control over the access to the city from other States, are in restraint of interstate trade, because their object or necessary effect was (1) to suppress competition between those engaged in interstate commerce, (2) to enhance the prices of articles of such commerce, (3) to burden the free transaction of such commerce by one engaged therein or (4) to control some part of such commerce. *Addyston Pipe Co.* v. *United States*, 175 U. S. 211; *Loewe* v. *Lawlor*, 208 U. S. 274; *Montague & Co.* v. *Lowry*, 193 U. S. 38; *Northern Securities Co.* v. *United States*, 193 U. S. 197; *Oklahoma* v. *Kansas Natural Gas Co.*, 221 U. S. 229; *Standard Oil Co.* v. *United States*, 221 U. S. 1; *Swift & Co.* v. *United States*, 196 U. S. 375; *United States* v. *American Tobacco Co.*, 221 U. S. 106; *United States* v. *Joint Traffic Ass'n*, 171 U. S. 505; *United States* v. *St. Louis Terminal*, 224 U. S. 383; *United States* v. *Trans-Missouri Freight Ass'n*, 166 U. S. 290.

A corner in cotton, which is a common object of interstate commerce and is produced in many States, is

clearly in restraint of trade because it interferes with the
free flow of such commerce. *Montague & Co.* v. *Lowry,*
193 U. S. 38; *Swift & Co.* v. *United States,* 196 U. S. 375,
398, 399; *Shawnee Compress Co.* v. *Anderson,* 209 U. S.
423, 434; *United States* v. *St. Louis Terminal,* 224 U. S.
383, 397, 405; *Gibbs* v. *McNeeley,* 118 Fed. Rep. 120, 126.

The temporary and feverish stimulation of competition
by the corner does not prevent it from being in restraint
of trade, as *Montague & Co.* v. *Lowry* and *United States*
v. *St. Louis Terminal,* each illustrates an increase of com-
petition incident to a combination in restraint of trade.

In response to the suggestion that the effect of a corner
on interstate commerce is only indirect and incidental,
we submit that the only cases wherein it has been held
that the contract or combination attacked was not in
violation of the Sherman Act because its effect on inter-
state commerce was only incidental or indirect were
*United States* v. *E. C. Knight Co.,* 156 U. S. 1 (so ex-
plained and limited in the *Trans-Missouri, Addyston
Pipe, Northern Securities, Swift & Co., Danbury Hatters,
Standard Oil,* and *American Tobacco* cases as to be of
little value as authority), *Hopkins* v. *United States,* 171
U. S. 578 (as explained in the *Addyston Pipe, Montague,*
and *Swift & Co.* cases), *Anderson* v. *United States,* 171
U. S. 604, and *Cincinnati Packet Co.* v. *Bay,* 200 U. S. 179.
Obviously those decisions that fixing charges for local
commission merchants and keeping out of business for
five years in connection with the sale of property, were not
in violation of the Sherman Act because of their purely
indirect effect on interstate commerce are no precedents
for holding that a corner in cotton affects interstate com-
merce only indirectly.

The lower court determined the meaning of the lan-
guage used in the indictment, to wit, what acts are charged
against the defendants, and such interpretation is con-
clusive upon this court. *United States* v. *Keitel,* 211 U. S.

370; *United States* v. *Biggs*, 211 U. S. 507. But under the Criminal Appeals Act this court has the right to determine whether the facts so alleged in the indictment constitute a violation of the Sherman Anti-trust Act. *United States* v. *Heinze*, 218 U. S. 532, 540; *S. C.*, 218 U. S. 550; *United States* v. *Bitty*, 208 U. S. 393.

*Mr. George P. Merrick*, with whom *Mr. William E. Church* was on the brief, for defendant in error Patten:

The argument of the Government is not confined to the allegations of the indictment. Black's Dictionary, 271; *Foss* v. *Cummings*, 149 Illinois, 353; *Samuels* v. *Oliver*, 130 Illinois, 73; *Wells* v. *McGeough*, 71 Wisconsin, 196.

The only effect of the Government's resort to the statement of overt acts is to accentuate essential defects of the indictment. That statement cannot, in law, and does not in fact, aid the indictment. *Pettibone* v. *United States*, 148 U. S. 197; *Smith* v. *United States*, 157 Fed. Rep. 721; *United States* v. *Patterson*, 55 Fed. Rep. 639; *United States* v. *Britton*, 108 U. S. 199.

Whatever restraint upon interstate commerce might result from acts charged, would be but indirect, remote and incidental. The statute only condemns acts having direct and immediate effect. *Addyston Pipe Co.* v. *United States*, 175 U. S. 211; *Aikens* v. *Wisconsin*, 195 U. S. 194; *Anderson* v. *United States*, 171 U. S. 604; *Bigelow* v. *Calumet & H. M. Co.*, 167 Fed. Rep. 721; *Cincinnati P. Co.* v. *Bay*, 200 U. S. 179; *Continental W. Co.* v. *Voight & Sons*, 212 U. S. 227; *Field* v. *Barber Asphalt Co.*, 194 U. S. 618; *Hopkins* v. *United States*, 171 U. S. 578; *Loewe* v. *Lawlor*, 208 U. S. 274; *Montague* v. *Lowry*, 193 U. S. 38; *Northern Securities Co.* v. *United States*, 193 U. S. 197; *Oklahoma* v. *Kansas N. G. Co.*, 221 U. S. 229; *Standard Oil Co.* v. *United States*, 221 U. S. 1; *Swift & Co.* v. *United States*, 196 U. S. 375; *United States* v. *E. C. Knight & Co.*, 156 U. S. 1; *United States* v. *Joint T. Assn.*, 171 U. S. 509;

*United States* v. *Trans-Mo. Freight Assn.*, 166 U. S. 290; *United States* v. *Union P. R. R. Co.*, 188 Fed. Rep. 102; *United States* v. *St. Louis Terminal*, 224 U. S. 383; *Washington & G. R. R. Co.* v. *Hickey*, 166 U. S. 521.

This court has no jurisdiction to review the judgment of the Circuit Court because that judgment was not based upon a construction by it of the Anti-trust Act, but upon repeated constructions thereof by this court. Even if technically this court has jurisdiction, it will not exercise it merely for the purpose of reaffirming propositions already settled by it. *Davies* v. *Slidell*, 154 U. S. 625; *Equitable Life Ass'n Soc'y* v. *Brown*, 187 U. S. 308; *Leonard* v. *V. S. R. R. Co.*, 198 U. S. 416; *United States* v. *Biggs*, 211 U. S. 507; *United States* v. *Bitty*, 208 U. S. 393; *United States* v. *Heinze*, 218 U. S. 532; *United States* v. *Keitel*, 211 U. S. 370; *United States* v. *Mescall*, 215 U. S. 26.

Mr. *John C. Spooner*, with whom Mr. *Joseph P. Colton, Jr.*, and Mr. *George Rublee* were on the brief, for defendants in error, Scales *et al.*:

Under the Criminal Appeals Act the court may only review the construction of the Sherman Act by the Circuit Court. *United States* v. *Biggs*, 211 U. S. 507; *United States* v. *Keitel*, 211 U. S. 370.

In sustaining the demurrer to the seventh count the Circuit Court did not wrongly construe the Sherman Act. That count does not charge a direct interference with interstate commerce. *Ware & Leland* v. *Mobile*, 209 U. S. 405; *Addyston Pipe & Steel Co.* v. *United States*, 175 U. S. 211; *Anderson* v. *United States*, 171 U. S. 604; *Hopkins* v. *United States*, 171 U. S. 578; *Northern Securities Co.* v. *United States*, 193 U. S. 197; *Standard Oil Co.* v. *United States*, 221 U. S. 65; *United States* v. *Joint Traffic Association*, 171 U. S. 505; *United States* v. *E. C. Knight Co.*, 156 U. S. 1.

The purchase of future contracts is not unlawful. *Board of Trade* v. *Christie Grain & Stock Co.*, 198 U. S. 236.

No violation of any law except the Anti-trust Act is charged. *Anderson* v. *United States*, 171 U. S. 615; *Whitwell* v. *Continental Tobacco Co.*, 125 Fed. Rep. 454, 457.

In sustaining the demurrer to the third count the Circuit Court did not wrongly construe the Sherman Act. *Harriman* v. *Northern Securities Co.*, 197 U. S. 291; *United States* v. *American Tobacco Co.*, 164 Fed. Rep. 712.

The *Northern Securities Case* and the *Tobacco Case* can be distinguished.

The Sherman Act is not an instrument by which a district attorney can arbitrarily curb the amount of profit which an individual can make in buying and selling commodities, or even in speculating on an exchange—merely by an allegation (not susceptible of definite proof) which he inserts in an indictment, that it will have certain effects on interstate commerce.

The seventh count does not charge monopoly or combination with regard to the sale of cotton.

The ground of the illegality of corners is that they are gaming contracts.

The prosecutor avoids the fundamental question whether the conspiracy described would directly restrain interstate commerce.

The restraint of trade charged is indirect by reason of the intervention of voluntary acts of independent human agents. See the "Squib" Case, reported as *Scott* v. *Shepherd*, 2 Blackstone, 892.

If the Government's contention that count seven sets forth an offense under the Sherman Act, then every general strike of workmen is condemned by that statute. Certainly no such result was contemplated by the framers of the statute, and no such doctrine was announced in *Loewe* v. *Lawlor*, where the act complained of was an

immediate interference with a manufacturer's trade; where defendants physically obstructed the liberty of the plaintiff to trade in interstate commerce.

The corner count does not charge any combination to withhold cotton from sale. The Circuit Court's construction of the indictment in that regard is conclusive. *United States* v. *Biggs*, 211 U. S. 507; *United States* v. *Keitel*, 211 U. S. 370.

A defective charge of conspiracy cannot be aided by averments of·overt acts. *Commonwealth* v. *Hunt*, 4 Met. 111; *Commonwealth*. v. *Shedd*, 7 Cush. 514; *Conrad* v. *United States*, 127 Fed. Rep. 798; *McConkey* v. *United States*, 171 Fed. Rep. 829; *M'Kenna* v. *United States*, 127 Fed. Rep. 88; *Pettibone* v. *United States*, 148 U. S.. 197; *Smith* v. *United States*, 157·Fed. Rep. 721; *United States* v. *Britton*, 108 U. S. 199; *United States* v. *MacAndrews*, 149 Fed. Rep. 823; *United States* v. *Milner*, 36 Fed. Rep. 890; *United States* v. *Patterson*, 55 Fed. Rep. 605.

The court has no jurisdiction to review the judgment of the Circuit Court.

MR. JUSTICE VAN DEVANTER delivered the opinion of the court. · ·

This is a . criminal prosecution under the Anti-trust Act of July 2, 1890, 26 Stat. 209, c. 647, the indictment being in eight counts. In the Circuit Court demurrers to the third, fourth, seventh and eighth counts were sustained and those counts dismissed, 187 Fed. Rep. 664, whereupon the Government sued out this writ of error under the Criminal Appeals Act of March 2, 1907, 34 Stat. 1246, c. 2564. The case has been twice orally argued.

At the second argument the Government expressly abandoned the third and fourth counts and challenged only the ruling· upon counts seven and eight. Thus, the

propriety of the ruling upon the first two need not be considered.

In passing upon the demurrers the Circuit Court proceeded first to construe the counts, that is, to ascertain with what acts the defendants are charged, and next to consider whether those acts are denounced as criminal by the Anti-trust Act, the conclusion being that they are not.

The limitations upon our jurisdiction under the Criminal Appeals Act [1] are such that we must accept the Circuit Court's construction of the counts and consider only whether its decision that the acts charged are not condemned as criminal by the Anti-trust Act is based upon an erroneous construction of that statute.

At the outset we are confronted with the contention that the decision is not based upon a construction of the statute. But to this we cannot assent. The court could not have decided, as it did, that the acts charged are not within the condemnation of the statute without first ascertaining what it does condemn, which, of course, involved its construction. Indeed, it seems a solecism to say that the decision that the acts charged are not within the statute is not based upon a construction of it.

Each of the counts in question charges the defendants and others with engaging in a conspiracy "in restraint of and to restrain," by the method therein described, "trade and commerce among the several States" in the supply of cotton available during the year ending September 1, 1910, such supply consisting of all the cotton grown in the

---

[1] The act is set forth in full in 211 U. S. at page 398, and rulings thereunder are found in *United States* v. *Bitty,* 208 U. S. 393, 399; *United States* v. *Keitel,* 211 U. S. 370, 398; *United States* v. *Biggs,* 211 U. S. 507, 518; *United States* v. *Mason,* 213 U. S. 115, 122; *United States* v. *Mescall,* 215 U. S. 26, 31; *United States* v. *Stevenson,* 215 U. S. 190, 195; *United States* v. *Heinze,* 218 U. S. 532, 540; *United States* v. *Heinze,* No. 2, 218 U. S. 547, 550; *United States* v. *Kissel,* 218 U. S. 601, 606; *United States* v. *Miller,* 223 U. S. 599, 602.

Southern States in that year and the cotton left over from prior years. The counts are long, and the acts which the Circuit Court treated as charged in them are indicated by the following excerpt from its opinion, the foot notes being ours:

"These counts are alike, with the exception of the statement of overt acts,[1] and each may be, broadly speaking, divided into three parts, which may be thus summarized:

"(1) The charging part contains a general charge of conspiracy in restraint of interstate commerce, with the usual formal and jurisdictional averments.

"(2) The second part contains a 'description of the trade and commerce to be restrained.' Under this head it is stated, in substance, that cotton is an article of necessity raised in the Southern States, which moves in large volume in interstate and foreign commerce, and that it is bought and sold upon the New York Cotton Exchange to such an extent as to practically regulate prices elsewhere in the country, so that future sales by speculators upon such exchange of more than the amount of cotton available at the time of delivery would create an abnormal demand and resultant excessive prices in all cotton markets.[2]

---

[1] One count contained a statement of overt acts, while the other contained no such statement, a difference not here material.

[2] In order that the brief summary and analysis of the third part may be better understood, the second part is here reproduced:

"DESCRIPTION OF TRADE AND COMMERCE TO BE RESTRAINED.

"And the grand jurors aforesaid, upon their oath aforesaid, do further present that for many years past cotton has been grown, one crop a year, in divers of the States of the United States, among others, Virginia, North Carolina, South Carolina, Georgia, Florida, Alabama, Tennessee, Mississippi, Kentucky, Louisiana, Oklahoma, Texas, Arkansas, Missouri and New Mexico; that such cotton has been and is an article of prime necessity to the people of the United States, and the growing and the spinning and manufacturing of the same into yarns and fabrics have necessitated the cultivation of many millions of acres of land in the States last aforesaid and the employment of many thou-

"(3) The third part contains a 'description of the method devised and adopted by the conspirators for re-

---

sands of persons, in those States and in other States of the United States, in connection with the planting, cultivating, picking, ginning, compressing, storing, selling, shipping, and transporting of such cotton; that about sixty per cent. of the cotton so grown has been shipped to and consumed in foreign countries in each crop year; that of the remaining forty per cent. of such cotton about one-half has been spun into yarns and manufactured into cotton fabrics by spinners and manufacturers in said Southern States for the use of the people of the United States and foreign countries, and the other half has been shipped to Northern States of the United States, among others, Massachusetts, Rhode Island, New York, Pennsylvania, New Hampshire, Maine, Connecticut, Maryland, New Jersey, and Delaware, in pursuance of sales of the same to spinners and manufacturers in the last-mentioned States, and there spun into yarns and manufactured into fabrics for the use of the people of the United States and foreign countries; that the demand for such cotton in foreign countries and in said Northern and Southern States has been steady and continuous throughout all portions of each crop year; that in the ordinary course of business said spinners and manufacturers have bought little or no cotton beyond that required by them for their immediate needs; that such cotton has been extensively bought and sold upon the Cotton Exchange in said city of New York for future delivery in the United States during current crop years, so much so that cotton bought and sold elsewhere in the United States than on that exchange has customarily been bought and sold at prices corresponding to the prices prevailing upon said exchange; that although, as the grand jurors aforesaid, upon their oath aforesaid, charge the fact to be, the rules of said Cotton Exchange at New York City have required that all sellers and purchasers of cotton upon that exchange for future delivery should contemplate the actual delivery and receipt of cotton sold and purchased by them there, it has been possible for more cotton to be sold at a given time or at given times upon said exchange for future delivery at a given time or given times during a current crop year by speculators, that is to say, persons not having any cotton in their possession, than would be in existence at such future time or times and available to such speculators for acquisition and delivery to the purchasers thereof; that under such circumstances it has been necessary for such sellers of cotton upon said exchange for such future delivery to make settlements with purchasers in cash or its equivalent, at the prices prevailing upon said

straining the trade and commerce.' It is alleged, at the outset, that the conspirators were to restrain trade and commerce by doing 'what is commonly called running a corner in cotton.' Averments then follow showing how the corner was to be brought about and its effect, which may be thus analyzed:

"(1) The conspirators were to make purchases from speculators upon the New York Cotton Exchange of quantities of cotton for future delivery greatly in excess of the amount available for delivery when deliveries should become due.[1]

---

exchange at the time or times such settlements have been made, as to whatever cotton such sellers were unable to acquire and deliver to such purchasers when such delivery was due; that the artificial condition produced by such excessive purchases, when made, has invariably created such an abnormal demand for cotton on the part of such sellers that very excessive prices therefor have prevailed upon said exchange, and upon all other exchanges and in all cotton markets, until after such settlements have been made, so that bona fide purchasers of cotton for consumption in spinning and manufacturing have been compelled for a time to pay the same excessive prices in order to obtain cotton for their needs; that the cotton crop for the crop year beginning September 1, 1909, and ending September 1, 1910, approximated ten million and five hundred thousand bales; that about two hundred and sixty-five thousand bales of cotton were left over and available at the beginning of said crop year of the crops of prior crop years; that the foregoing allegations of this paragraph of this count of this indictment apply to the cotton of said crop year and to that of prior crop years; and that each of said conspirators, when so conspiring as in this count of this indictment set forth, well knew all the premises in this count aforesaid."

[1] The language of the charge is: "They were to make purchases from day to day upon said Cotton Exchange at New York City, from speculators, of quantities of cotton for future delivery at different times during said crop year greatly in excess of the amount of cotton which would be in existence and available for delivery to them by the sellers thereof when such deliveries were due, reference being had to the usages and requirements of said trade and commerce which are in this count above set forth."

"(2) By these means an abnormal demand was to be created on the part of such sellers who would pay excessive prices to obtain cotton for delivery upon their contracts.

"(3) The excessive prices prevailing upon the New York Exchange would cause similar prices to exist upon other cotton markets.

"(4) 'As a necessary and unavoidable result of their acts, said conspirators were to compel' cotton manufacturers throughout the country to pay said excessive prices to obtain cotton for their needs or else curtail their operations.

"(5) And also, as 'a necessary and unavoidable result' of said acts, an unlawful obstruction would be put upon interstate trade and commerce.[1]

"The offence charged, then, is a conspiracy in restraint of trade through the operation of a 'corner,' . . ."

Although ruling that there was no allegation of a specific intent to obstruct interstate trade or commerce and that the raising of prices in markets other than the Cotton Exchange in New York was "in itself no part of the scheme," the court assumed that the conspirators intended "the necessary and unavoidable consequences of their acts," and observed that "prices of cotton are so correlated that it may be said that the direct result of the acts of the conspirators was to be the raising of the price of cotton throughout the country."

Upon the second argument the defendants contended, and counsel for the Government expressly conceded, that "running a corner" consists, broadly speaking, in acquiring control of all or the dominant portion of a commodity with the purpose of artificially enhancing the price, "one of the important features of which," to use the

---

[1] Of these allegations the court said in its opinion: "We must also assume that the allegations of the results to follow the conspiracy are more than the conclusions or economic theories of the pleader and amount to allegations of fact."

language of the Government's brief, "is the purchase for future delivery, coupled ·with a withholding from sale for a limited time;" and as this definition is in substantial accord with that given by lexicographers and juridical writers, we accept it for present purposes, although observing that not improbably in actual usage the expression includes modified modes of attaining substantially the same end.

Whilst thus agreeing upon what constitutes running a corner, the parties widely differ as to whether what is so styled in this instance contained the elements necessary to make it operative. The point of difference is the presence or absence of an adequate allegation that the purchasing for future delivery was to be coupled with a withholding from sale, without which, it is conceded by both parties, the market could not be cornered. But the solution of the point turns upon the right construction of the counts, and that, as has been indicated, is not within our province on this writ of error. We must assume that the counts adequately allege whatever the Circuit Court treated them as alleging. Its opinion given at the time, although not containing any express ruling upon the point of difference, shows that the counts were treated as alleging an operative scheme, one by which the market could be cornered. The court spoke of it as "contrary to public policy," as "arbitrarily controlling the price of a commodity," and as "positively unlawful in any State having a statute against corners." Evidently, it was assumed that every element of running a corner was present. We accordingly indulge that assumption, but leave the parties free to present the question to the District Court for its decision in the course of such further proceedings as may be had in that court.

We come, then, to the question, whether a conspiracy to run a corner in the available supply of a staple commodity, such as cotton, normally a subject of trade and commerce among the States, and thereby to enhance

artificially its price throughout the country and to compel all who have occasion to obtain it to pay the enhanced price or else to leave their needs unsatisfied, is within the terms of § 1 of the Anti-trust Act, which makes it a criminal offense to "engage in" a "conspiracy in restraint of trade or commerce among the several States." The Circuit Court, as we have seen, answered the question in the negative; and 'this, although accepting as an allegation of fact, rather than as a mere economic theory of the pleader, the statement in the counts that interstate trade and commerce would necessarily be obstructed by the operation of the conspiracy. The reasons assigned for the ruling, and now pressed upon our attention, are (1) that the conspiracy does not belong to the class in which the members are engaged in interstate trade or commerce and agree to suppress competition among themselves, (2) that running a corner, instead of restraining competition, tends, temporarily at least, to stimulate it, and (3) that the obstruction of interstate trade and commerce resulting from the operation of the conspiracy, even although a necessary result, would be so indirect as not to be a restraint in the sense of the statute.

Upon careful reflection we are constrained to hold that the reasons given do not sustain the ruling and that the answer to the question must be in the affirmative.

Section 1 of the act, upon which the counts are founded, is not confined to voluntary restraints, as where persons engaged in interstate trade or commerce agree to suppress competition among themselves, but includes as well involuntary restraints, as where persons not so engaged conspire to compel action by others, or to create artificial conditions, which necessarily impede or burden the due course of such trade or commerce or restrict the common liberty to engage therein. *Loewe* v. *Lawlor*, 208 U. S. 274, 293, 301.. As was said of this section in *Standard Oil Co.* v. *United States*, 221 U. S. 1, 59:

"The context manifests that the statute was drawn in the light of the existing practical conception of the law of restraint of trade, because it groups as within that class, not only contracts which were in restraint of trade in the subjective sense, but all contracts or acts which theoretically were attempts to monopolize, yet which in practice had come to be considered as in restraint of trade in a broad sense."

It well may be that running a corner tends for a time to stimulate competition; but this does not prevent it from being a forbidden restraint, for it also operates to thwart the usual operation of the laws of supply and demand, to withdraw the commodity from the normal current of trade, to enhance the price artificially, to hamper users and consumers in satisfying their needs, and to produce practically the same evils as does the suppression of competition.

Of course, the statute does not apply where the trade or commerce affected is purely intrastate. Neither does it apply, as this court often has held, where the trade or commerce affected is interstate, unless the effect thereon is direct, not merely indirect. But no difficulty is encountered in applying these tests in the present case when its salient features are kept in view.

It was a conspiracy to run a corner in the market. The commodity to be cornered was cotton, a product of the Southern States, largely used and consumed in the Northern States. It was a subject of interstate trade and commerce, and through that channel it was obtained from time to time by the many manufacturers of cotton fabrics in the Northern States. The corner was to be conducted on the Cotton Exchange in New York City, but by means which would enable the conspirators to obtain control of the available supply and to enhance the price to all buyers in every market of the country. This control and the enhancement of the price were features of the conspiracy

upon the attainment of which it is conceded its success depended. Upon the corner becoming effective, there could be no trading in the commodity save at the will of the conspirators and at such price as their interests might prompt them to exact. And so, the conspiracy was to reach and to bring within its dominating influence the entire cotton trade of the country.

Bearing in mind that such was the nature, object and scope of the conspiracy, we regard it as altogether plain that by its necessary operation it would directly and materially impede and burden the due course of trade and commerce among the States and therefore inflict upon the public the injuries which the Anti-trust Act is designed to prevent. See *Swift & Co.* v. *United States*, 196 U. S. 375, 396–400; *Loewe* v. *Lawlor*, 208 U. S. 274; *Standard Oil Co.* v. *United States*, 221 U. S. 1; *United States* v. *American Tobacco Co.*, 221 U. S. 106. And that there is no allegation of a specific intent to restrain such trade or commerce does not make against this conclusion, for, as is shown by prior decisions of this court, the conspirators must be held to have intended the necessary and direct consequences of their acts and cannot be heard to say the contrary. In other words, by purposely engaging in a conspiracy which necessarily and directly produces the result which the statute is designed to prevent, they are, in legal contemplation, chargeable with intending that result. *Addyston Pipe & Steel Co.* v. *United States*, 175 U. S. 211, 243; *United States* v. *Reading Co.*, 226 U. S. 324, 370.

The defendants place some reliance upon *Ware & Leland* v. *Mobile County*, 209 U. S. 405, as showing that the operation of the conspiracy did not involve interstate trade or commerce, but we think the case does not go so far and is not in point. It presented only the question of the effect upon interstate trade or commerce of the taxing by a State of the business of a broker who was dealing

in contracts for the future delivery of cotton, where there was no obligation to ship from one State to another; while here we are concerned with a conspiracy which was to reach and bring within its dominating influence the entire cotton trade of the country and which was to be executed, in part only, through contracts for future delivery. It hardly needs statement that the character and effect of a conspiracy is not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole. *Montague & Co.* v. *Lowry,* 193 U. S. 38, 45–46; *Swift & Co.* v. *United States,* 196 U. S. 375, 386–387.

As we are of opinion that the statute does embrace the conspiracy which the Circuit Court treated as charged in counts seven and eight, as construed by it, its judgment upon those counts is reversed and the case is remanded for further proceedings in conformity with this opinion.

*Reversed in part.*

Mr. Justice Lurton, dissenting.

The majority seem to base a judgment of reversal upon the assumption that the court below interpreted the counts in question as charging all the elements essential to a technical "corner." To this view of the opinion of the court below I do not assent. As I interpret that opinion the court held the count bad because it did not charge a "corner." Thus interpreted there was no error in quashing the count. I am authorized to say that the Chief Justice concurs in this dissent.

Mr. Justice Holmes also dissents.